We'll hear the next case on the calendar, Force v. Facebook. Mr. Katz. Good morning, Your Honor. Mayor Katz on behalf of the Plaintiffs' Appellants. In an appeal like this, I think it's very easy to lose the forest for the trees. So I'd like to start, the details are important, we're going to get back to them, but I'd like to start taking a step back and just looking at the appeal more broadly. I think that it's important because it'll help us to see a little bit the extent of the District Court's error and the very significant burden facing Facebook in this appeal. There are seven distinct issues that Facebook has to win on all, all of them, and the briefs make clear, I think, that the issues turn very heavily in Plaintiff's Favor. Number one, and we're going to get back to this one specifically in a moment, the Communications Decency Act applies extraterritorially. Number two, the Communications Decency Act hasn't been raised prematurely. Number three, Facebook's very active role, for profit, I might add, doesn't amount to the development even in part of any Hamas content. Number four, Plaintiff's anti-terrorism claims somehow relate to Facebook's duties as a publisher. Number five, the ATA does not civilly enforce federal criminal counterterrorism statutes, even though Congress said that they do. Number six, the affirmative defense created by Section 230, which is federal common law based on statute, but a federal common law derivation from the statute, which has no textual basis, does not yield to the expressed statutory commands of the ATA. And number seven, the more specific and later enacted ATA does not control when in conflict and to the extent of the conflict with the CDA. Regarding extraterritoriality, the Supreme Court has made clear many times that Congress does not legislate extraterritorially unless it says so, unless it indicates intent to legislate extraterritorially. And everyone admits that the CDA was not intended to apply extraterritorially. There's nothing in the statute itself that indicates an intent for extraterritorial application. And all of the facts here, all of the relevant conduct that is pertinent to this case, and all pertinent conduct occurred overseas. Well, the pertinent conduct is that there was litigation filed here, right? The litigation is not conduct that Congress is regulating. Well, arguably, according to Facebook, right, the carve-out for Internet service providers not to be treated like speakers is designed to protect them from domestic litigation, right? Yes, and so too every cause of action. But Morrison makes clear that the fact that you have a cause of action doesn't make you, doesn't put the case, doesn't put the relevant conduct of the case where the cause of action is exercised in the district court. The definitional provision could be understood to regulate conduct. If you look at 230 C-1, regulating lawsuits against interactive computer services and their users. So just going back to Judge Sullivan's question, why isn't it the case that the objects of the statute's solicitude are the service providers and users being sued, so that a suit in an American court amounts to a domestic application of the statute? Congress and the CDA, and the entire CDA, this is very clear from the enactment, this is very clear from the titles that Congress gave this statute. C is called Protection for Good Samaritan Blocking and Screening of Offensive Material. Congress is trying to clean up the Internet. That's very clear. In defining the words publisher and speaker, in the context of Internet providers, what Congress was doing was enabling private enterprise, a vehicle through which to go through that process of cleaning up the Internet without risk of liability. That is what Congress... It's not the extraterritoriality issue, and that is the cases from the Supreme Court, I think Judge Sullivan pointed this out, seem to regulate conduct, the statutes, whether it's criminal conduct or civil conduct. In other words, securities violations or RICO. Those cases that say we're not going to reach into other countries unless the statute says that we should, so the presumption applies, but here it's a defense in a court of the United States, kind of like a statute of limitations defense. Immunity is like that, whether it's qualified immunity or sovereign immunity. Those are defenses that are posed in the courts of the United States. Isn't that different in the extraterritoriality analysis, whether you're regulating conduct that could be abroad or just the courts of the United States? I don't see how it's different from a cause of action, Your Honor. Why? Because a cause of action gives a plaintiff, a would-be plaintiff, the right to state his claims in a federal court. A cause of action looks at the conduct that you did outside of the United States, whether you're trading securities from London or engaging in a RICO conspiracy in Europe. That regulates the conduct. Those are codes of conduct that we're trying to enforce, but here it's like a statute of limitations defense or immunity defense. Respectfully, it's not like a statute of limitations defense because it's a defense on the merits. It gets to the merits of what we're talking about, that is, the conduct that occurred overseas. So, first of all, I wouldn't concede that a statute of limitations automatically applies extraterritorially to conduct that's entirely extraterritorial, but even arguendo, accepting that point, that's entirely not on the merits, and this very clearly is a merits defense in that it talks about the merits of the case and the conduct that Congress was regulating overseas, or that Congress was regulating, which in this case occurred overseas. So immunity defense relates to the merits of the case, the conduct of the case? Any immunity defense, I'm sorry? I'm trying to analogize this to whether it's regulating conduct abroad or is more in the nature of an immunity defense like qualified immunity or sovereign immunity. Where does this fall in the analysis? That's a good question. Qualified immunity, I think, is a difficult one. I'm not sure of any case that it deals with qualified immunity in this context. Prosecutorial immunity, for example, maybe would be more like a statute of limitations because you're looking at the person. It doesn't really matter what they did. Or judicial immunity, same thing. It's the person in that role that is immune, and regardless of what he did wrong, it might have been egregious. But as long as it's in the course of employment or whatever the guidelines are, that might be different. Again, I'm not taking a position. I don't think that the Supreme Court has spoken to this. My inclination would be to say that it doesn't make any difference, but I will concede that would be a harder case. How would you respond to the view that your analysis on extraterritoriality creates a rather gaping loophole in the regulatory structure that Congress set up in the CDA, if you could just hear me out and tell me where the understanding may be wrong? So a plaintiff could now sue a provider or a user of an interactive computer service for content that was posted by a third party, so long as the content was posted and displayed outside of the United States. And doesn't that open people up to liability for a lot of conduct? Congress was trying to protect children within the United States, U.S. citizens, certainly. So a U.S. citizen abroad might be a different case, if maybe that's what you're getting to. But certainly, I mean, Congress was most primarily acting within the United States. A child who accesses material that should have been, in Congress's view, protected from that child within the United States, the case would be a lot closer. I mean, obviously it depends on the circumstances. Let me give you a specific example. Sure. Could someone bring a defamation story, a defamation lawsuit over a story on the BBC's U.S. website that describes information provided by someone in the United Kingdom? About a U.S. citizen? Yeah. I would think that would be domestic conduct. I mean, you're talking about the injury is experienced within the United States. Okay. So if a plaintiff tries, under your analysis, tries to hold a service provider or user liable based on content posted abroad, she would have to overcome the presumption against extraterritoriality to bring her claim in the first place, right? Yes. So what about when plaintiffs bring common law causes of action where there may not be that presumption against extraterritoriality? Chief Justice Katzmann, I'm not sure where you're going, but the presumption deals with Congress's work. I just want to understand how you see this all working. Yeah. No, a pure common law claim shouldn't be subject to the presumption against extraterritoriality. It's just a presumption, which is rebuttable. Thank you, Your Honor. If you want to take a few more minutes, go ahead, because you have a big case. Thank you. It is a big case. There's a lot of issues. We'll give you extra time as well. Thank you, Your Honor. Let's turn to the affirmative defense issue. As this Court made clear in Ricci, and other courts as well have said so, including, by the way, Zarin, which is a very interesting source for this, the Fourth Circuit case, the affirmative defense created by the Communications Decency Act rather creates an affirmative defense, which must be raised after an answer is filed and pursuant to the answer, not appropriate in a 12b6 motion unless the complaint makes the defense inevitable. If the allegations in the complaint in a defamation case, it's most simple, makes very clear that the defense ought to apply because we're attributing the defamatory content to the Internet service. That's a different story, but that's not the case here. You don't have clear allegations in the complaint that make the defense inevitable. Because of that, it's Facebook's burden to allege facts, first of all. Why is that, though? You've got a 134-page complaint. Why isn't there enough before the district court to conclude, even on the pleadings, that this defense should be found in a 12b6 setting? Well, first of all, yes. What else does the district court need to know? The complaint, I think, makes very clear that we're not saying that we're attributing third-party content to Facebook, certainly not within its duty as a publisher or speaker. We're saying that Facebook took a very active role over here. The allegations in the complaint call into question the elements of the affirmative defense. It's Facebook's burden, secondly, and because of that, it's Facebook's obligation to allege the facts. Now, if the complaint, again, made the defense inevitable, that's a different story. But I'm saying that's not this complaint. It's Facebook's burden to allege facts necessary to assert the defense, and it's Facebook's burden to state a case as to why the defense ought to apply. That never really happened. Facebook moved under 12b6, but it was moving on the basis of allegations that I would argue certainly don't make it inevitable. You know, we can argue about the extent to which it's a closed question. I think it's not. But it's certainly not inevitable that the defense applies. And in that context, it's inappropriate to address the issue at this point. Facebook has to put in an answer and allege facts and give us a circumstance, a set of facts to argue about, so we can determine the disaccord in the first instance. But under, you know, following Ricci, right, there are no magic words that have to be uttered. And as I look at the memorandum of Facebook's memorandum of law in support of its motion to dismiss, it did assert that the elements of CDA immunity were satisfied as to the family's complaint and put forth arguments as to each element. Why isn't that enough? It put forth arguments, but as I recall, it didn't parse the complaint. It didn't really address allegations in the complaint, certainly not in total. Putting forth argument isn't enough. They have to allege facts. And as I've said, the complaint doesn't make it inevitable, and that's the standard. The complaint argues that they're liable because of the inflammatory statements made by Hamas, by their tendency to incite using the Facebook medium. Isn't that exactly what you're alleging? No, Your Honor. We're alleging that Facebook is, with regard to the primary liability issues, which is different from secondary liability, which I didn't get to. Secondary liability has a different analysis. But speaking about primary liability in the first instance, we allege that the material on Facebook's website approximately caused the injuries that the plaintiff suffered. But Facebook's duty, and that's the important word here. I'm looking for the name of the case right now. It's skipping my memory. But one of this Court's cases says this very clearly, that Facebook's duty doesn't arise as a publisher or a speaker, and that's what's important. Facebook's duty arises as a citizen, not to support terrorists. And Facebook violated that duty. That duty is independent of anything that Facebook said or didn't say. But they're supporting terrorism by doing what? They're supporting terrorism by giving Facebook a platform. Sorry, by giving terrorists, by giving Hamas a platform, by giving Hamas networking capabilities, by facilitating their networking. On facilitating networking, could you say more about the algorithms? Sure. Your point about the algorithms, because I think that is a concerning point. And if you could say more about how these algorithms develop the user's content, in your view. And also, if you could, as a follow-up, I don't find any allegations in your proposed complaint that those matchmaking algorithms played a role in the chain of causation that led to specific attacks. Could you say more about that as well? Okay. There's a lot there. Right. I'll start with the algorithms. There's a lot hidden within the word algorithm, Your Honor. We learned on Friday, interestingly, very timely, that Facebook is collecting data on its female users regarding their menstrual cycles. That Facebook now knows, I don't know how... I'm sorry. Their menstrual cycles. Facebook knows about the menstrual cycles of, I don't know how many women, but apparently a lot. Stands to reason they're using their algorithms. We don't know this for sure. This all came out on Friday in the Wall Street Journal. Using their algorithms to monetize that information. Exactly how, again, we don't know. The algorithms do a lot. It's not passive. It looks passive, because it's unfamiliar to most of us. To me, certainly. I would like it more to a bowling ball. When a bowler rolls a bowling ball down the alley, depends how fast he's throwing the ball, it might take a couple of seconds before the ball gets there. And then it creates all kinds of havoc. The person who threw the ball is standing there passively during that time. But he did something, right? He caused the ball to roll down the alley and did it in a certain way. When Facebook created its platform, it created these algorithms designed to do certain things inevitably. It's passive. Facebook is passive in the sense that as it's happening, Facebook is standing there twiddling its thumbs, so to speak. But Facebook, the entity, is responsible for all these things that happen. And it did quite a lot. It created this very, very complicated system, which is able to bring people together all over the world. And let's think about what Facebook did in this case that we speak about in the brief. And there's a Rule 60 motion pending before the district court. This came out later. It's just a fascinating thing. The Center for Extremism Projects studied that, that we mentioned in the brief. You have a Nambian lone wolf who's minding his own business. He's interested in terrorism. Knows nobody. Through Facebook is now the central bridge for many international ISIS networks around the world. Linking Indonesia . . . Can I just follow up on Chief Judge Kasten's question, though? Sure. In the district court's decision, and I was going to ask this of opposing counsel, really, but I'll try it with you. The district court pointed to allegations in your complaint where you say Facebook generates targeted recommendations for each user, promoting content, websites, advertisements, users, groups, and events that may appeal to a user based on their usage history. In this way, Facebook connects users with other individuals and groups based on projected common interest activities, contacts, and patterns of usage, etc. In other words, it seems to be at least bringing people together with similar interests and targeting particular users and web groups that have particular interests. For example, somebody who's interested in ISIS might be interested in learning how to make a bomb. Would an algorithm arrange for that connection? A hundred percent, Your Honor. You know what we're heading to. Is that content? Is that the use of such algorithms? And I'm not saying they exist. I don't know. But the manipulation through algorithms, does that bring Facebook into a different place? That's my question. As a content provider rather than just a phone book or classified ads where you break out the types of cars. That's the question. Is that manipulation crossing into content? I think the contrast with the phone book is excellent. And we mentioned this in the briefs, if I remember correctly. When you have Yellow Pages, for example, and I want to look up terrorism in the Yellow Pages. I don't think it exists, but let's say. I'd have to go actively search for it. I'd have to get at the Yellow Pages, open up the right page, and make phone calls. Facebook does all that work for me. Facebook puts me in contact with people who I would have no access to from all over the world. And in this context, it's interesting. Because the people that we're talking about live underground, so to speak. They're clandestine, because they have to be, because what they do is illegal in most countries. And because of that, it's very difficult to contact them. There's no phone number. I can't call 1-800-ISIS. The only way that I can get to ISIS or Hamas in this case is through entities like Facebook. And Facebook being probably the prime example. Where by expressing to Facebook my interest in what Hamas is doing and liking its activities, I'm put in contact immediately, entirely passively, without doing anything. Facebook puts me in contact with ISIS commanders all over the world. And it is multinational. So entities that might not know of each other's existence would know of each other's existence because of these algorithms. They don't simply know of each other. They're talking to each other now through Facebook. So a phone book is the same thing, right? I might not know about who provides these types of services, but for a phone book that alphabetizes and gives me the numbers. Is that also facilitating? A phone book requires active participation on my part. Facebook requires active participation on your part. And listen until you provide information that allows those algorithms to make connections. There will be no connections, right? One time. I have to do one thing. So I only need to turn to the phone book one time, and there I find the numbers that I need. And make a phone call, and make another phone call, and another phone call. All these people are brought to me. Have you persuaded the Department of Justice to bring a material support case against Facebook? I don't believe we tried, Your Honor. As far as you know, has the Department of Justice ever attempted to bring a material support claim against Facebook? Your Honor, the ATA was enacted precisely because Congress wanted private parties involved in the enforcement of these statutes. It's very complicated, time-consuming for the government to make a criminal case against these parties. The individuals that are affected most directly have a much bigger incentive to do so. The government could do what you did in your complaint. It's not that they can't. They've chosen not to for whatever reason. I don't know why. But we see very clearly from Congress that this is the reason. This is one of the reasons that Congress wrote the statute the way that they did. They wanted private parties doing this. I mean, that's what Congress says in the legislative history. Well, except that they carve out an exception for folks who are Internet service providers, that they won't be treated like the speakers, right? And so that's really, it seems to me, the issue here. Well, it's not an exception to the ATA. It's an exception generally, but it's an exception that applies only when you're suiting a duty as a publisher or as a speaker, which the ATA does not do. But if and when the Department of Justice is persuaded that this constitutes material support, then they could get restitution for all of your clients, right? In theory. And probably without a third coming off the top, right? In theory. Okay. Is there anything, a question that I had to ask, and I know I packaged several questions in one. Yes, I'm sorry. Is there anything in the proposed complaint that specifically ties, in terms of the chain of causation, specific attacks that caused the plaintiff's injuries? The honest answer is I don't remember, but it's not necessary. Boeing makes this very clear, the Seventh Circuit on Box decision, as well as Holder. Now, Holder was on 2339B, not the civil provisions of the ATA. But there's pages in that decision that would be directly relevant to what we're talking about. By funding these people, what they do is they kill people for a living. That's their business. That's their job. By giving them money, you're making that happen. By giving them money or substantial support, in this instance, through services. You're facilitating that whole process. The amount of the support and tying individual dollars to individual taxes is completely unnecessary. And, again, that's clear from Holder. On your aiding and abetting liability argument, would the phone company, let's say, would Verizon be liable if it continued to provide cell service to those who may use the phones to plan attacks? I'll give you a doctrinal answer and a more logical answer, for lack of a better word. The answer is no, first of all. But why? A phone book is not making profit through giving me a phone number. I mean, obviously, it sells the books. And there's a marginal profit, perhaps. An additional number that it has there, giving me that information, makes it more valuable a little bit. I'm talking about a cell service, not just a phone book. I'm sorry? A cell service? Cell service. Like Verizon provides cell service. Verizon, first of all, has no idea who these people are, as far as we know. If they did, if they knew that they were providing service to terrorists, facilitating the terrorist communication, perhaps. Perhaps. I mean, it would depend on the facts. But in the normal course, you wouldn't assume that Verizon necessarily knows who it's dealing with. It uses an address. It uses a name. I don't know the extent to which Verizon has to do background checks on its customers. I would think not very much. But I could be wrong. So if you had, let's say, for example, an international cable service like CNN, some parts of Fox may be international. And they broadcast segments about terrorist groups and about the recruitment of terrorists. And if viewers might say, oh, this is an exciting group to join, would those cable networks be liable for aiding and abetting? Certainly not. The ATA does not prohibit talking about terrorism. The ATA does not prohibit advocating for terrorism, as long as you're not providing substantial assistance to the terrorists. What the ATA does prohibit is, for example, the New York Times giving Hamas a page in which to do whatever they want. Here's a page to advertise in or to advocate for what you do, to advertise what you do. That the New York Times can't do. If the New York Times wants to praise Hamas for whatever it's doing because it's decided that it likes what Hamas does, that's perfectly fine. That's not material support. Even though, as you point out, Your Honor, it might cause people to then want to join Hamas. That's true. But that's not what the New York Times is doing. They're editorializing, and they're allowed to do that. The ATA doesn't say otherwise. Thank you, Your Honor. Thank you. And another 13. Chief Judge Katzmann, and may it please the court, Craig Primus from Kirkland & Ellis for Facebook. Let me begin by just saying that this complaint walks right into the core protection of the CDA. Paragraphs 127 through 155 are replete with allegations about the content that Hamas allegedly placed on Facebook. Then paragraphs 543 to 547 and paragraph 552 all criticize Facebook for not removing this Hamas-based content. And the federal reporters are replete with decisions saying that the decision to remove content or even the failure to remove content that somebody wanted to or perhaps should have removed is protected by the CDA. So this complaint, four square, is pretty straightforward, and I think Judge Garifas recognized that when he dismissed the complaint. With regard . . . Are you saying that there was no need to go beyond the 12B6 stage of the case to address the special defense? Is that why? Absolutely, Your Honor. There are many cases. Most of these cases are resolved at 12B6, and Ricci said it could be resolved at 12B6. The D.C. Circuit said that, and courts across the country are resolving these at 12B6, and it's what the Jones Court said in the Sixth Circuit, which is that if you don't provide this immunity early in the case, it is essentially lost because then companies like Facebook, which carry content from billions of people, would be sued to death because every time somebody posted something that another person didn't like or was offended by, there would be litigation and discovery over it. So courts have, in fact, applied this early in the case, and the face of this complaint certainly supports the rules set out in Ricci. Could I ask you to help me understand the implications of Western GECCO, since it's the most recent case of the Supreme Court on the presumption against extraterritoriality? And here I'm really focused on methodological issues, how we should go about thinking about these issues. So this is a little convoluted, so please bear with me. So as you know, in that case, the court looked at a patent statute which stated, and I quote, the court shall award the claimant damages adequate to compensate for the infringement. The respondent in that case argued that the statutory focus was on awarding damages, just as you're arguing here that the focus is on granting immunity. But as I read that, the Supreme Court's case, a decision in Western GECCO, it didn't accept that argument. And what it said was, and I'm quoting, what a statute authorizes is not necessarily its focus. And what the court determined instead was that the statute's focus was the conduct for which the statute seeks to provide a remedy. In other words, the court said the infringement. So if that's true, and if I'm misunderstanding something about the Supreme Court's decision, please let me know. If that's true, why isn't the focus of 230C1 the conduct for which the statute seeks to grant immunity? In other words, the provision of information? Yes, Your Honor. I think Judge Droney hit on a good point when he said that this situation we have here doesn't fit neatly into the existing Supreme Court two-step approach to extraterritoriality. Now, I understand your question to be, how do we make this case fit in with what the Supreme Court just said in Western GECCO, and I will address that. But I do just want to point out that in Ricci, this court did refer to the CDA as an immunity. So for purposes of both the extraterritoriality issue and that Your Honor was asking, posing counsel about, and for the current question, this is an immunity from suit as recognized by this court. So Western GECCO said you can go to the second step without dwelling on the first, so we'll go to the second. And I understand Your Honor's point being that the Supreme Court in Western GECCO, in the context of a different statute, did draw a distinction between kind of the conduct or the issue being regulated and how to remedy it. And here, we do believe that the immunity is a domestic act and the lawsuit is the conduct being regulated. We stand by that argument. We think that fits within Western GECCO. But in any event, if you want another layer to get behind this immunity, I don't think it's the conduct. Well, it is the conduct of providing an interactive computer service, but the policy and findings provisions of the CDA make clear that these were for the benefit of Americans and to promote the development of these companies domestically in the United States and with a minimal amount of government regulation. And the mechanism for doing that was the immunity that we're here defending in this court. So it would fit comfortably with the Western GECCO. One of the challenges, I think, that I have in reading Western GECCO is that the court could very well have, you know, flat out approached it methodologically in the way that you are arguing with respect to 230C1, but it didn't. It could have looked, it could have said that the claimant is the party the provision seeks to protect there. It didn't do that. And so I'm trying to, you know, parse it all out. Why did they pursue the course that they were pursuing? Because it doesn't quite fit the, you know, the analysis that you're making. Well, I think I was trying to make a separate point. We do stand by the analysis in our brief, but the separate point I was making is that the CDA, if you look at the findings and policy provisions of that statute, make clear that the purpose of this statute, the focus, is to promote a vibrant and open minimally regulated Internet in the United States for the benefit of all Americans. And so that could be analogized to the first step of Western GECCO where they talk about the infringement provision. And then the second part is how do you do that? It's through this immunity. But there's nothing about this that would suggest that they're regulating conduct overseas. It's all about lawsuits in the United States to protect companies that distribute content within the United States, which is what we do. Well, material support alleged here takes place where? California or New York or someplace else? Is there anything in the complaint that indicates where the material support of providing algorithmic analysis and processing information provided by users all around the world, where does that take place? Your Honor, I do want to be clear before I answer that specific question, that in addition to affirming on the CDA ground, we also have argued and believe that this can be affirmed alternatively on the failure to state a claim under the ATA. And we don't believe that there's adequate material support allegations. And one thing I do want to point out is that in Lind versus Arab Bank, the Second Circuit was clear that merely alleging material support is not enough to state a claim for direct liability. There also have to be the other elements of a violent act and trying to influence another government. So they haven't, even if they can fit within that one part of the material support statute, they haven't stated a claim for international terrorism. But to the specific question, the complaint is not clear about where the particular service of providing this platform is to people overseas. I thought that your adversary had alleged that the Israeli government has repeatedly contacted Facebook's office in Israel, asking it to stop providing Facebook to Hamas. The allegation is in the complaint, Your Honor. And on that point, I do also want to point out, because I think it does get lost in the shuffle, that Facebook makes effort every single day to get terrorist content off of its platform. It's prohibited on the platform. We understand that people can nonetheless get on and put it in. And Facebook makes efforts every day. Thousands of people are employed to get rid of this stuff. And what the CDA does is gives us a buffer zone to do that diligently, and if we don't catch everything, to not have to defend all those lawsuits. What Judge Droney, I think, in his questions pointed out, or at least by way of a question that you could answer, is the use of these algorithms is a way of creating networks. That is, whereas in the normal course, without these algorithms, the individual would have to affirmatively go out and try to figure out, who are my friends, who are my allies, who should I call? In the case of the development of these algorithms, they are essentially ways that Facebook creates networks, because it makes these entities that might not have been aware of one another, aware of one another. And isn't that an issue? Well, let me address that, and I need to address it, I think, in two parts, because it both does state a claim that would be barred by the CDA, but as described, it also couldn't possibly state a claim under the Anti-Terrorism Act. But I want to make sure I answer both pieces of that. With regard to the Communications Decency Act, what would have been called algorithms is really just a mechanism to make the user content posted by millions or billions of other people more useful and available to all the people who use the platform. And it's no different than Google organizing search results, or LinkedIn trying to link up an employer and a person applying for a job. It's the everyday workings of our modern Internet, which has grown up under the protection of CDA 230. And so while there is a negative connotation cast upon this, it is really just the editorial decision that the courts have consistently recognized as protected by the CDA as to how to display, prioritize, in some cases remove, or organize the otherwise completely unwieldy content on one's website. And I would just point out that the plaintiffs do have an allegation in their complaint that these algorithms, which do connect people, but that is the service that's provided, that these algorithms they're saying should be used to remove Hamas's content, which both confirms that this is all inherently bound up in the content. These algorithms and suggestions don't work without reference to the content. And it also confirms that there are cases about the removal decision, which courts, including Ricci, have unanimously said is protected. I do want to point out, I think my opposing counsel said that he was drawing a distinction, I believe in response to a question from Judge Sullivan, about the duty versus the causation. I think it was in response to whether this is all about content. And I believe counsel said that content caused the injury, but what they're suing on is duty. Well, that answer confirms that the CDA 230 protection applies, because they're saying one of the critical elements of their claim is bound up with the content in that. Let's say that you had a staff person on Facebook, and that staff person just monitors the various websites and decides that, you know, here are two entities that really should get to know one another, and then directly links these entities together. Would you say that that's part of Facebook's job as a publisher? Does it fit? Yes, certainly. I would say that that determination about how to present the content or how to prioritize it for other people would be part of an editorial decision that would be protected as part of CDA 230. And I should point out, and this case was not... You mean if they're two terrorist groups? Well, yeah, I mean, they don't do that, obviously. But, yes, I mean, that would be... Just from the position of whose content is it, it is the content of third parties, and this would be the editorial determination as to where to put it and how to display it and who should see it. That would be covered. And, you know, that type of thing has been addressed in many other cases. And, in fact, one case I do want to just cite for the record, because we didn't have it in our brief, but it became much more apparent after we received the reply brief, is the Kimsey v. Yelp case from the Ninth Circuit. It's 836F31263. And the claim there was that Yelp was taking people's reviews, they were consolidating them, giving them star ratings, and then having them distributed either through advertisements on other platforms or on Google. And that is very analogous to the hypothetical just posed, and it's analogous to what's been argued by plaintiffs. And there the Ninth Circuit rejected that claim, said it was covered by CDA 230, and it said Yelp is not liable for disseminating the same content in essentially the same format to a search engine, as this action does not change the origin of the third-party content. And they went on to say that, simply put, proliferation and dissemination of content does not equal creation or development of content. And the Ninth Circuit is not the only court that has gotten at that point. The Eleventh Circuit in the Dalbenko v. Google case said Google's use of algorithms to manipulate search results is protected. And in each of those cases you could, and I think the Ninth Circuit said this in Kimsey v. Yelp, you could recharacterize the function as being transformation rather than presentation. And the Ninth Circuit rejected that and said it would put a big hole into the CDA. Briefly, I don't know if I'm on. Oh, yes. Please. And the reason really for the algorithms is to help people get in touch with others of similar interests, but it's also for you, you get more advertising revenue, because you're trying to seek out people who may have similar interests, create a broader broadcasting group for your advertisers, right? Yes. That's the reason behind the algorithms. Yes, but that would not, I mean, that's just stating what Facebook's business is. You're saying it's wrong. Yeah. That's the reason for the algorithms, right? Well, it's to make the platform more useful to other people. If it turned out historically that turned out to be a very profitable business, but any online platform, when it starts out, is trying to, they obtain content, they present it in a certain way that people might find more useful than the person who did it before, and if it turns out to be profitable, that's great, and maybe not, but all of them would be protected because that's the basic function that is protected by the CDA. Your representatives, somebody who works for Facebook, decided that they were going to affirmatively seek out Hamas and Al Qaeda and tell them what a great service Facebook provides for what they hope to achieve and touts the effectiveness and the efficiency of Facebook and encourages them to use Facebook. Would that change the viability calculus here? Well, I don't think so for purposes of CDA. It might make it a clearer case of stating a claim, putting aside the CDA, of maybe being covered under the ATA. You're saying it's still immune from suit, even under that scenario. Yes, as long as Facebook's not creating the content or requiring the illegality. I think the roommate's decision in the Ninth Circuit gets at that distinction because in roommates, the Ninth Circuit addressed a situation where users were required to answer questions that when they answered them were violative of the Fair Housing Act, and the Ninth Circuit said you can't do that. But then the balance of the opinion, which often gets overlooked, said that if people are posting their own comments on the roommate's website saying discriminatory or terrible things, that roommates would be protected under the CDA against claims relating to that content because it's third-party content that they haven't sponsored or written. And I do want to be careful because, well, I think I'll leave the answer at that, Your Honor. There is a distinction that the cases have drawn that makes sense because once you open that up, it would be very difficult to determine what would be covered and what would not, and it would undermine the CDA. I do want to just briefly, if I may, address the Anti-Terrorism Act because we do want to make clear that we believe that a claim has not been stated under that. I already pointed out under Arab Bank v. Lind that material support, even if they pled it, would not be enough. But there is also an issue of proximate cause, and, Your Honor, Chief Judge Katzman, I think you pointed out that there's no allegation that the algorithms played a role in the chain of causation as set forth in this complaint in this case, and that is absolutely true. There are five terrorist incidents that are at issue under the ATA because they are the ones that involved Americans. The complaint goes through many, many of Hamas's terrorist acts, but the five that matter are the ones that involved Americans, and there's no allegation that Facebook was used in any of those to support, finance, or was even used by the terrorists in connection with those particular attacks. But this is not something Judge Garifas determined, right? He did not. This would be an alternative basis for affirmance because it is on the face of the complaint. But if the core allegation is that Facebook is providing material support, what we're pointing out is that with the five incidents that relate to Americans, it just doesn't line up because the typical allegation is that people from Hamas say bad things on Facebook, then a terrible attack happens that was not talked about on Facebook, and then afterwards somebody from Hamas praises it. That's not approximate cause. There's just no allegation that Facebook was in the chain of causation that led to these five particular issues. And then finally, under aiding and abetting, again, it's the same point. There is no allegation that Facebook was used for any particular attack, and that would be just a necessary element in order to get past first base on an ATA claim, unless there are any questions. I'd like to just bring you back to the extraterritoriality analysis and just try to push your argument, if I could. So let's say that we were to find that the focus of 230C1 is on limiting liability and that the relevant conduct is the domestic lawsuit in which the statute is brought into play. How would you respond to the view that that would entirely exempt the provision from extraterritoriality? Because the relevant conduct would always be domestic. Well, I don't think that that would undermine the analysis. It just happens that in this particular case, yes, it would be a domestic application each time. But I don't think the Supreme Court's jurisprudence forecloses that possibility. And I would also add that in each of these cases, there's a very different statutory language, very different statutory construct, and if that's how it happens here, then that would just be the way it played out under the Supreme Court's analysis. But your view is one could reach your view and also say that it doesn't mean that every liability-limiting statute becomes exempt from the presumption against extraterritoriality. Absolutely not. These cases are done statute by statute, and in the context of what happens for CDA 230, may very well be different from other statutes that are not before the court, and I don't think it would necessarily mean that they all get the same treatment under the Supreme Court's jurisprudence. The court would have to do the analysis. Thank you, Your Honor. Mr. Katz, you'll have two minutes. Thank you, Your Honor. Opposing counsel said that the complaint is unclear as to where Facebook services were provided. Respectfully, that's not entirely correct. The complaint does say that the services were provided in Israel, in the West Bank. The complaint goes into detail, as Chief Justice Katzman mentioned, regarding Benjamin Netanyahu's statements regarding Facebook and to Facebook. The proposed amended complaint goes into more detail regarding Facebook's review in Ireland, if it happened. So that is there. Two, Facebook's role through these algorithms, I wanted to make one point very clear. Facebook sees itself and has demonstrated a tremendous ability to impact the way people think. Through its news feed, for example, Facebook has impacted emotion, and it was rather proud of being able to do that. This is not the Yellow Pages, Your Honor. Facebook is able to give us information that makes us happy, makes us sad. It motivates us and causes us to desist from various actions. Facebook takes a very, very active role in the things that it does. Moving on to Lindy, very briefly. Lindy did say that, and it's true, it's from the face of the statute, that we have to comply not just with 233A or D, whether you're primary liability or secondary liability, but also 23311, which is the definition of international terrorism. Regarding secondary liability, the act of international terrorism was the act of Hamas against my clients. There's no question that that was international terrorism. There's no question of proximate causation in that case. The only question, again, as I mentioned before, is whether or not there was the terms of secondary liability were met, and they were, as the briefs make clear. With regard to primary liability, I refer the Court again to Boehm. The Seventh Circuit's en banc decision there makes very clear what to do. And Rothstein, this Circuit's opinion regarding proximate causation quotes Boehm favorably. It doesn't adopt Boehm because it wasn't relevant to what was going on in that case, but it discusses Boehm, and it says in those types of facts Rothstein was dealing with support to Iran, which is sovereign. It has lots of things that it does that are perfectly legitimate and good. Hamas is a terrorist organization. And as Boehm speaks out and as Rothstein provided its approval, to an extent at least, when you give resources to a terrorist organization, what you're doing, Congress has decided, is bad and is liable, is grounds for liability, both criminal and civil. Thank you, Your Honor. Thank you both for your arguments. It's a complicated case. Thank you so much. Court will reserve decision.